**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION**

| | |
|---|---|
| SHERRELL DOWDELL-MCELHANEY, | |
| Plaintiff, | |
| v. | Civil Action No.: |
| GLOBAL PAYMENTS INC. and TOTAL SYSTEM SERVICES, LLC, | 4:20-cv-00289-CDL |
| Defendants. | **JURY TRIAL DEMANDED** |

**SECOND AMENDED COMPLAINT**

COMES NOW Plaintiff Sherrell Dowdell-McElhaney (hereinafter, "Plaintiff" or "Dowdell"), by and through the undersigned counsel and brings her Second Amended Complaint, with the express permission of Defendants, pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.,* the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.*, the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*, as amended, and the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* Plaintiff alleges that Defendants Global Payment Systems, Inc. and Total System Services, LLC subjected Plaintiff to discrimination based on sex, race, age, disability, including through its failure to provide a reasonable accommodation, subjected Plaintiff to retaliation after she engaged in protected activities, and failed to provide compensation to Plaintiff at the overtime rate, respectfully showing the Court as follows:

**JURISDICTION AND VENUE**

1.

This Court has original jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. §§ 1331 & 1343 and the enforcement provisions of the Americans with Disabilities Act and the Fair Labor Standards Act.

2.

Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Plaintiff was employed in, and the events underlying this action occurred in, Columbus, Muscogee County, Georgia, which is located within this judicial district.

**PARTIES**

3.

Plaintiff is a citizen of the United States and a resident of Georgia.  At all times relevant to this suit, Ms. Dowdell-McElhaney has been employed with Defendants Global Payments, Inc. and Total System Services, LLC (collectively, "Defendants").

4.

At all relevant times, Ms. Dowdell-McElhaney was considered a covered, non-exempt employee under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans with Disabilities Act, and the Fair Labor Standards Act.

5.

Defendant Global Payments, Inc. (hereinafter, "Defendant GPI") is a Domestic Profit Corporation incorporated under the laws of the State of Georgia.  Defendant GPI maintains a principal office address at 10 Glenlake Parkway, North Tower, Atlanta, Fulton County, Georgia, 30328. Defendant GPI may be served with process through its Registered Agent, C T Corporation System, located at 289 South Culver Street, Lawrenceville, Gwinnett County, Georgia 30046.

6.

Defendant GPI is engaged in in an industry affecting interstate commerce, it has annual revenue in excess of $500,000.00, and it has employed far in excess of fifteen employees in every week of 2021, 2020, and 2019. Accordingly, Defendant GPI is a covered entity and employer within the meaning of Title VII of the Civil Rights Act, the Age Discrimination in Employment Act, and the Americans with Disabilities Act.  Defendant GPI is a covered enterprise under the Fair Labor Standards Act.

7.

Defendant Total System Services, LLC (hereinafter, "Defendant TSYS") is a Foreign Limited Liability Company organized under the laws of the State of Delaware.  Defendant GPI maintains a principal office address at One TSYS Way, Columbus, Muscogee County, Georgia 31901. Defendant TSYS may be served with process through its Registered Agent, C T Corporation System, located at 289 South Culver Street, Lawrenceville, Gwinnett County, Georgia 30046.

8.

Defendant TSYS is engaged in in an industry affecting interstate commerce, it has annual revenue in excess of $500,000.00, and it has employed far in excess of fifteen employees in every week of 2021, 2020, and 2019. Accordingly, Defendant TSYS is a covered entity and employer within the meaning of Title VII of the Civil Rights Act, the Age Discrimination in Employment Act, and the Americans with Disabilities Act.  Defendant GPI is a covered enterprise under the Fair Labor Standards Act.

9.

In 2019, while Plaintiff was employed with Defendants, Defendant Global Payments acquired Defendant TSYS in a merger.  As a result, Defendants collectively, and jointly controlled the means and manner of their employees' work performance, the terms, conditions, and privileges of employees' employment, and employees' compensation.  Moreover, after the merger, Defendants collectively share offices, ownership, and management of their respective entities.

10.

For the purposes of this action, Defendants are a single, integrated enterprise, and/or joint employer under all laws giving rise to this action.

## STATEMENT OF FACTS

11.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 10, as if the same were set forth herein.

12.

Ms. Dowdell-McElhaney is black or African-American female who is currently fifty-six-year-old.

13.

Ms. Dowdell-McElhaney also suffers from pain in severe pain and the physical deterioration of her lower back as a result of a severe car accident. Specifically, she has long term injuries to her back muscles and spine that cause pain that substantially limits one or more major life activity such as lifting heavy objects, sitting for long periods of time, and standing for long periods of time without rest.

14.

Ms. Dowdell-McElhaney also experiences aggravated migraines, which are recurring primary headaches that cause severe throbbing or pulsating pain, and frequently come with additional symptoms such as nausea, sensitivity to light and noise, weakness, and fatigue. Aggravated migraines, and the associated symptoms, substantially impair Ms. Dowdell-McElhaney's ability to working, to concentrate on tasks, and her tolerance for stress.

15.

The aforementioned medical conditions, individually and collectively, substantially impact Ms. Dowdell-McElhaney's ability to perform major life activities such as lifting, performing manual tasks, reaching, sitting, sleeping, standing, walking, and working.

16.

As a result of these conditions, Ms. Dowdell-McElhaney has been advised by her licensed medical providers to avoid lifting objects in excess of ten pounds, prolonged standing, and prolonged sitting.

17.

Ms. Dowdell-McElhaney has a Bachelor of Arts degree, *cum laude*, in Political Science, a Doctor of Jurisprudence, and a Master of Laws degree in Litigation.

18.

Due to her education and experience, Ms. Dowdell-McElhaney has, at all times relevant to this case, been interested in a career related or tangential to the law and has sought positions that would benefit from her education and experience.

19.

Ms. Dowdell-McElhaney was employed with Defendants on-and-off for approximately seven years, and she was continuously employed with Defendants from 2016 through 2020.

20.

At all times at issue, Ms. Dowdell-McElhaney's performance was exemplary.

21.

Ms. Dowdell-McElhaney served in a variety of roles with Defendants, including as a customer service representative and a fraud analyst.

22.

The essential duties of these positions included communicating with customers, reviewing and investigating fraud claims, and providing colleagues with support and training.

23.

Ms. Dowdell-McElhaney often came into work early, and she stayed well into the evening, to do her job duties.  Moreover, she often felt like she was having to pick up slack from coworkers who were frequently absent or otherwise failed to complete their own work.

24.

Ms. Dowdell-McElhaney's supervisors were aware that she frequently worked far in excess of forty hours per week, but Defendant failed to provide Ms. Dowdell-McElhaney with compensation at the appropriate rate of overtime.

25.

There were many days where Ms. Dowdell-McElhaney would be the only individual on her entire team of sixteen people in the office and working.

26.

Ms. Dowdell-McElhaney was qualified for her positions, and she was performing the essential duties and responsibilities of the positions, as listed her the job description and otherwise expected by Defendants.

27.

Up to and until her termination in November 2020, Ms. Dowdell-McElhaney consistently received exemplary ratings on her appraisals and evaluations.

28.

Ms. Dowdell-McElhaney first applied to work for Defendants in September of 2014 for an opening in the position of Fraud Analyst II.  While the position was not in Defendants' legal department, Ms. Dowdell-McElhaney wanted to work in this position because such employees work closely with the legal department, and Ms. Dowdell-McElhaney felt like the duties closely-aligned with her relevant background and experience.

29.

Ms. Dowdell-McElhaney accepted the position of Fraud Analyst II. However, when she arrived at work the first day, Defendants advised Ms. Dowdell-McElhaney that their needs had changed, and Ms. Dowdell-McElhaney was asked to accept the position of Customer Service Representative I.

30.

Customer Service Representative I was inferior to the position for which Ms. Dowdell-McElhaney applied, but she accepted the position on the condition that she be considered for a transfer to Fraud Analyst II should such a position become available.

31.

Ms. Dowdell-McElhaney worked for Defendants as a Customer Service Representative I, but she was never given the opportunity to even apply for Fraud Analyst II, even though several such positions became available and were filled during this initial six-month tenure working for Defendants.

32.

These positions were filled by young, white applicants who were less educated, less experienced, and less qualified than Ms. Dowdell-McElhaney.

33.

In July 2014, after six months of not being considered for any fraud analyst position, Ms. Dowdell-McElhaney voluntarily resigned.

34.

At no time did Ms. Dowdell-McElhaney receive any disciplinary actions during her tenure as a Customer Service Representative I.

35.

In November 2015, approximately eighteen months after her resigned, Ms. Dowdell-McElhaney saw that there was a job opening for Paralegal II in Defendants' legal department.  Ms. Dowdell-McElhaney applied for the Paralegal II and was interviewed by the General Counsel over hiring.

36.

The interviewer told Ms. Dowdell-McElhaney that he was "thrilled" with her skills and experience, and he thought that Ms. Dowdell-McElhaney would be a very useful addition to the

team.  He also said that believed she was overqualified to work as a paralegal because she had a law degree.

37.

Ms. Dowdell-McElhaney expressed her continued interest in the position, and she accepted the interviewer's offer to schedule a second and final interview with a panel of in-house counsel.

38.

Defendants failed to follow up with Ms. Dowdell-McElhaney, and she did not hear back about the second interview, as she had been told.  Ultimately, her initial interviewer told Ms. Dowdell-McElhaney that he was "sorry," but the legal department had "someone else in mind who need[ed] the job" and wanted it very bad.  Ms. Dowell-McElhaney responded to this information asking that Defendants interview her any way.  The interviewer said that he thought they had made a decision.

39.

Defendants ultimately hired a young white female, with no prior legal experience, training, or knowledge, over Ms. McElhaney.

40.

In or about February 2016, Defendants solicited applications for the open position of Fraud Analyst II.  Just as she had done in 2014, Ms. Dowdell-McElhaney applied once again for the position of Fraud Analyst II.

41.

Ms. Dowdell-McElhaney was interviewed the same week she applied and was hired on the spot after her interview.

42.

Beginning in February 2016, and continuing for the next six months, Ms. Dowdell-McElhaney worked in the "in-bound" division of Defendants' Fraud Department.  Analysts in the in-bound division were expected to handle calls from customers from approximately ten of the numerous banks served by Defendants.

43.

In or around August 2016, Ms. Dowdell-McElhaney's direct supervisor, Clarence Anderson, told Ms. Dowdell-McElhaney that while Mr. Anderson thought that Ms. Dowdell was doing "fine" in in-bound, he thought she would do even better in the "out-bound" division. Analysts in out-bound are assigned appropriately five times more banks than the in-bound analysts, and they are expected to review pending fraud lines before contacting customers for more information or to process the claim.

44.

While Ms. Dowdell-McElhaney found herself doing substantially more work in the out-bound division, including mandatory overtime shifts at times, she was not compensated at a higher rate of pay.

45.

Positions in out-bound are considered less desirable than those in "in-bound," and it was evident to Ms. Dowdell-McElhaney that this change was a demotion.

46.

Ms. Dowdell-McElhaney's initial position in in-bound was filled by a younger, white male.

47.

When Ms. Dowdell-McElhaney's colleagues found out about her educational background and experience, they questioned why she was placed on the out-bound team. The coworkers explained that this transfer was not a promotion as Ms. Dowdell-McElhaney had been told, that the employees in out-bound did not want to work and often had a bad attitude, and they suggested that Ms. Dowdell-McElhaney was transferred because she is an older, harder worker. Ms. Dowdell-McElhaney's coworkers referred to her as the "mom" of the team.

48.

Ms. Dowdell-McElhaney worked in the out-bound fraud department from August 2016 until she was terminated by Defendants in November 2020.

49.

On or about March 11, 2018, Ms. Dowdell-McElhaney informed Defendants that she had been in a severe car accident. She also provided Defendants with all her relevant medical documentation, which showed her injuries and her physicians' recommendations that she be able to both sit and stand while she worked.

50.

These requests for accommodation were sent on behalf of Ms. Dowdell-McElhaney by Dr. Jay Brodwyn, Dr. Grant J. Scarborough, and several medical facilities.

51.

Despite her injuries, Ms. Dowdell-McElhaney was still able to complete all of the essential functions of her position, regardless of whether her workspace was modified. However, Ms. Dowdell-McElhaney and her medical providers made the aforementioned request to avoid constant pain and to avoid exacerbation of her injuries.

52.

Specifically, Ms. Dowdell-McElhaney and her physicians requested that Ms. Dowdell-McElhaney be permitted to have and use a desk that gave her the option to work while either sitting or standing to reduce and avoid her severe and chronic back pain and weakness.

53.

Defendants denied Ms. Dowdell-McElhaney's request for such a sit-and-stand desk without explanation.

54.

Despite denying Ms. Dowdell-McElhaney's request, Defendants frequently granted a similar accommodation to younger, white employees. The employee who were given a sit-and-stand desk had worked with Defendants for a shorter period of time, they were less experienced, less educated and qualified, and did not appear to have a medical or physician need for such a desk.

55.

By way of example, Defendants provided a sit-and-stand desk for Tracie Welchel a younger white female who served as an Associate Manager, notwithstanding that Ms. Dowdell-McElhaney had submitted her request for the same a substantial time prior to Ms. Welchel.

56.

From March 2018 until November 2020, Ms. Dowdell-McElhaney made numerous, routine requests for such a desk, many of which were supported with new documentation from her medical providers. However, the request was denied each time.

57.

Beginning in 2018, after two years of employment with Defendants, Ms. Dowdell-McElhaney began submitting numerous applications for open positions within the company that would have been consider promotions for Ms. Dowdell-McElhaney.

58.

None of Ms. Dowdell-McElhaney's applications were accepted, nor did she even receive a single interview from her over 60 applications. Moreover, most of the applications that she submitted were denied within just a few hours from the time they were submitted.

59.

Additionally, after Ms. Dowdell-McElhaney started to submit applications for promotions, Defendants began to harass, bully, and intimidate her.

60.

It is Ms. Dowdell-McElhaney's belief that she was denied these opportunities based on her race, sex, age, and her disability and requests for accommodation.  She formed this belief based off of Defendants' prior conduct, which suggested that people who were black, female, older, or who have a disability should "know their place" and not ask for more than they are given.

61.

Specifically, Defendants retaliated against Ms. Dowdell-McElhaney when she asked for accommodations and promotions when Defendant's abruptly assigned Ms. Dowdell-McElhaney to a new workspace in a cubical that was known by employees, unofficially, as the "dungeon."

62.

The "dungeon" was cold, soiled, and filled with broken equipment as it had been used as a *de-facto* dump for the entire office. When Ms. Dowdell-McElhaney was told to move, it took her

more than two weeks to clean her new workspace and remove all of the equipment from the cubical.

63.

There was no apparent reason for Defendants to move Ms. Dowdell-McElhaney to this space other than to harass or bully her.

64.

Despite working in the out-bound division of the fraud department for almost five years, Ms. Dowdell-McElhaney never received a promotion, and any raises that she received were insubstantial.

65.

By contrast, Ms. Dowdell-McElhaney began to quickly notice that her colleagues in out-bound who were white, as well as those who were of Asian and Latino dissent, tended to be considered and receive promotions every six months to one year, and some of the aforementioned colleagues were promoted as many as four to five times during the same period in which Ms. Dowdell-McElhaney received no promotions and/or increases in pay.

66.

During her most-recent tenure, Ms. Dowdell-McElhaney applied for over 60 different positions, promotions, and internal transfers within the companies.

67.

Ms. Dowdell-McElhaney received none of the positions or promotions for which she applied, despite the fact that she was often the only candidate with the requisite credentials for the position.

68.

These positions were invariably filled with young white candidates who were less educated, experienced, and qualified than Ms. Dowdell-McElhaney.

69.

For example, on one occasion, Ms. Dowdell-McElhaney and a younger, white female, Samantha Lynn, who worked on Ms. McElhaney's team both submitted applications for the position of Government Relations.   Unlike her colleague, Ms. Dowdell-McElhaney was never offered an interview.  Ms. Dowdell was also unlike her coworker because she actually had a degree and experience in the relevant fields.  Ms. Dowdell-McElhaney later learned that her coworker had been selected for the position.

70.

Similarly, in May 2019, Defendants selected one of Ms. Dowdell-McElhaney's coworkers for a promotion to the position of Fraud Investigator on the newly-created First Party Fraud Team. The individual selected for this position, Michael Murphy, was a white male in his early 20s, and a person whom Ms. Dowdell-McElhaney trained when Ms. Murphy was assigned to work as a member of her team.  Apparently, the coworker did not have to apply for the position, and he was simply invited to take the position by his supervisors.

71.

When Ms. Dowdell-McElhaney learned of her coworker's invitation to join the First Party Fraud Team, she asked Mr. Anderson once again why she had not also received an invitation to apply, and she asked that she be considered for an opening.  Mr. Anderson responded that it was a "business need," and that Ms. Dowdell-McElhaney was "doing well" in the out-bound division.

Mr. Anderson added that he did not have final say on matters like this, so she would have to speak to one of Defendants' directors.

72.

The May 2019 incident was not the first time that she had overheard or found out that members of management had told specific people to apply for an open position.

73.

Ms. Dowdell-McElhaney continued working diligently, and she found herself to have the largest case load of any member of her department.

74.

However, after she was passed over for consideration for the position in May 2019, Ms. Dowdell-McElhaney began to reflect on the fact that she was frequently being treated differently than her colleagues.  Specifically, she realized that she was frequently the only individual on her sixteen-person team in the office on Mondays because her coworkers had apparently partied over the weekend. Defendants were refusing to consider Ms. Dowdell-McElhaney for positions for which she qualified, but her colleagues with less experience and tenure, but those individuals were younger, of a different racial or ethnic background, and were often male, quickly and frequently received promotions.  Ms. Dowdell-McElhaney also realized that she was often not provided with a preference for taking holidays or personal leave that she should have been entitled due her seniority and tenure over employees with other backgrounds.

75.

Moreover, around this time, Ms. Dowdell-McElhaney met with a company executive who spent over two hours asking Ms. Dowdell-McElhaney about her job, how she managed the

workload, and about the operations of her department. At the end of the meeting, the executive told Ms. Dowdell-McElhaney that she was a "great asset to her team as well as the company."

76.

While Ms. Dowdell-McElhaney's direct supervisor, Mr. Anderson, is also black, he had previously referred to himself as an "Uncle Tom," a derogatory epithet to describe a person who betrays their own race by participating in the group's oppression, whether willingly or unwillingly, and he had also said that he would do what he needed to do to feed his family.

77.

Ms. Dowdell-McElhaney had even spoken with the Director of Human Resources, Tim Sanders, about her disappointment that she was not even considered for the new First Party Fraud Team, but she had been told by HR Director Sanders that, if she was unhappy, then she should quit and look for employment outside of Defendants.

78.

As a result of the aforementioned discrimination, as well as the failure of her supervisors to address her concerns, from approximately May through July 2019, Ms. Dowdell-McElhaney began compiling information and documents, as well as drafting a Charge of Discrimination that she intended to file with the Equal Employment Opportunity Commission.

79.

On or about September 16, 2019, Ms. Dowdell-McElhaney met with an EEOC investigator, discussed he experience, and she expressed her intent to file a charge of discrimination alleging age, race, sex, and disability discrimination.

80.

However, on the same day, the EEOC prepared a "Form 5 Charge of Discrimination," only alleging discrimination based on age, and Ms. Dowdell-McElhaney filed the Charge the same day.

81.

Several days after she filed her Charge, Ms. Dowdell-McElhaney told Mr. Anderson that she had initiated action with the EEOC.

82.

Specifically, Ms. Dowdell-McElhaney told Mr. Anderson that she had filed the Charge because younger employees, who were of different racial backgrounds and were often male, were frequently receiving promotions, while Ms. Dowdell-McElhaney was not even being considered for promotions even though she was more highly-educated and had more experience than the coworkers getting promotions.

83.

Ms. Dowdell-McElhaney also told Mr. Anderson that she felt like she was being discriminated against by Defendants' based on their refusal to provide her with the accommodation she requested for her disabilities.

84.

During that conversation, Ms. Dowdell-McElhaney gave Mr. Anderson a copy of the EEOC Charge to review.

85.

On or about October 1, 2019, Ms. Dowdell-McElhaney asked Mr. Anderson for permission to make copies of her time sheets, accolades sent by supervisors, and her numerous applications for promotions and transfers to other positions within Defendants' organization.  Mr. Anderson

knew that Ms. Dowdell-McElhaney intended to use these documents to support her EEOC Charge of Discrimination.

86.

Mr. Anderson told Ms. Dowdell-McElhaney that she could make the copies and do what she needed to do, so long as she did it on her breaks and it did not interfere with work, and she did not make copies of confidential customer information.

87.

Ms. Dowdell-McElhaney promised she would only do it on her breaks and that she would begin working on the copies the next day.

88.

The next day, Ms. Dowdell-McElhaney arrived at work and performed her job duties. However, during her breaks, she began making copies of the aforementioned documentation.

89.

As Ms. Dowdell-McElhaney learned, Mr. Anderson had unexpectedly not reported to work that day.

90.

As Ms. Dowdell-McElhaney worked her copies, she felt like she was being watched by her coworker, Makayla Ray, someone that she knew was close to Mr. Anderson.

91.

After she had been observing Ms. Dowdell-McElhaney making copies, Ms. Ray abruptly left the room.  Soon thereafter, a Human Resources Business Associate, Chris Yarborough, came to the department and approached Ms. Dowdell-McElhaney.

92.

When he arrived, Mr. Yarborough took the copies from Ms. Dowdell-McElhaney, and demanded that she follow him immediately to his office.  Ms. Dowdell-McElhaney complied and followed behind Mr. Yarborough to the rear of Defendants' offices.  Ms. Dowdell-McElhaney could see that numerous employees watched her being escorted by Mr. Yarborough.

93.

When the two arrived in the Human Resources office, Mr. Yarborough explained that he had been watching Ms. Dowdell-McElhaney making copies on security cameras, adding sarcastically that "*surely* the copies don't contain confidential information."

94.

Ms. Dowdell-McElhaney explained that she had been given permission to make copies, and she told Mr. Yarborough about the type and nature of the documents she had been copying, assuring him that they did not contain any confidential cardholder information. Ms. Dowdell-McElhaney did not mention her EEOC Charge at this time, but she explained that she had made the copies to submit to Human Resources, including the new Director of Diversity and Inclusion, all in Defendants' main office.

95.

Mr. Yarborough accused Ms. Dowdell-McElhaney of trying to steal the company's information and then he scoured through the dozens of pages for anything that might be considered confidential.

96.

Out of numerous pages of documents, Mr. Yarborough discovered one email conversation, which had been copied because it contained a compliment from a supervisor, that Mr. Yarborough discovered contained only the last four of digits of a customer card number.

97.

While Mr. Yarborough admitted that the only issue was the one email with the redacted card number, he said that he was going to take a "deeper dive," and immediately demanded that Ms. Dowdell-McElhaney turn over her security badge.  Thereafter, she was paraded through the building while her coworkers watched.  Then, Ms. Dowdell-McElhaney was then immediately walked out of the building around 5:00 pm.

98.

After Ms. Dowdell-McElhaney left the building, she approached her car and noticed that an apparent member of law enforcement was standing with one of Defendants' employees on the sidewalk and in close proximity to Ms. Dowdell-McElhenny's vehicle.  While neither person spoke to her, they watched Ms. Dowdell-McElhaney drive away.

99.

The next day, Ms. Dowdell-McElhaney received a phone call at 11:00 am from Mr. Yarborough, who said that Defendants had discovered no wrongdoing and that Ms. Dowdell-McElhaney needed to report to work immediately.  Ms. Dowdell-McElhaney suggested that, since half of the day had already gone by, it would be more appropriate for her to come in first thing Monday morning.

100.

Upon information and belief, Defendants' HR Department knew about Ms. Dowdell-McElhaney's Charge of Discrimination during the incidents that occurred during the first week in October 2019. Alternatively, Defendants may have learned about Ms. Dowdell-McElhaney's Charge when they contacted Mr. Anderson to inquire into the reason for making the copies and if he had given his permission for her to proceed.

101.

Upon her return to work, Ms. Dowdell-McElhaney requested that the copies that she made be returned to her, but Defendants refused to provide Ms. Dowdell-McElhaney with them.

102.

After this incident, Ms. Dowdell-McElhaney began to be subjected to retaliation by way of an increased workload, less desirable assignments, and continued denial of applications for promotions or to new positions.

103.

In April 2020, Defendants began sending home employees in response to the COVID-19 Pandemic.

104.

Defendants were selective as to which employees would work from home during this time. In making these selections, Defendants disproportionately selected its younger, non-black employees to telework, while requiring black employees to continue working in-person in the office.

105.

When Ms. Dowdell-McElhaney learned that some employees were being permitted to work from home, she immediately approached Mr. Anderson and requested that she be permitted to telework.  Ms. Dowdell-McElhaney expressed her concern about the health and safety of her husband, whom was considered as "high risk" of serious consequences if infected by COVID-19. Ms. Dowdell-McElhaney explained that she was concerned about the virus due to her own medical condition as well.

106.

Mr. Anderson refused her request to telework, saying that he believed that distractions at home would result in Ms. Dowdell-McElhaney being less productive.

107.

Soon thereafter, on April 20, 2020, Ms. Dowdell-McElhaney contacted Human Resources to see if there was any other way for Ms. Dowdell-McElhaney to reduce her time working in the officeas she was extremely concerned about her husband's safety.

108.

When Ms. Dowdell-McElhaney told the Human Resources Representative about her husband's medical condition, she was immediately granted permission to telework.

109.

Having gone around or over her supervisors and getting permission from Human Resources to telework, Ms. Dowdell-McElhaney's supervisors, including, Mr. Anderson, were obviously frustrated and upset with her.

110.

As a result, Ms. Dowdell-McElhaney's supervisors increased her workload, both through the number of cases she was assigned, and by assigning her to cases from Defendants' more-challenging clients with the most amount of fraud.

111.

When asked why Defendants had given Ms. Dowdell-McElhaney so many new assignments, her supervisors now said it was so that she would not be distracted by things that were occurring in the workplace, and she would be able to handle the increased caseload as a result of the increase in productivity.

112.

When Ms. Dowdell-McElhaney initially began teleworking, she ran into a number of technological issues.  Before these issues were ultimately resolved, her supervisors simply told her that, if Ms. Dowdell-McElhaney was unable to resolve the tech issues, she would have to begin working in the office again.

113.

From April 2020 through November 2020, Ms. Dowdell-McElhaney met all of the requirements and expectations of her position despite the increased workload.

114.

During this time, Ms. Dowdell-McElhaney again requested an accommodation in the form of not being required to work overtime, citing her medical condition requiring her to get more rest than she was able to get with her current schedule.

115.

Defendants denied this request, and instead increased Ms. Dowdell-McElhaney's workload.

116.

On November 11, 2020, Ms. Dowdell-McElhaney was called into the office and was told that she was under review on the basis that, in one of the thousands of files she had worked, Ms. Dowdell-McElhaney had indicated that she had called a customer twice when she had not. Ms. Dowdell-McElhaney had indeed only called the customer in question once, but she had confused the documentation for that customer with another customer that she had, in fact, called two times.

117.

On the same day, Defendants demanded that Ms. Dowdell-McElhaney end her telework and return to the office. In addition to the aforementioned medical conditions of herself and her husband, Ms. Dowdell-McElhaney shared her concern about the rising number of COVID-19 infections around the same time.

118.

One week later, on November 18, 2020, Ms. Dowdell-McElhaney was terminated, effective immediately. According to Defendants, Ms. Dowdell-McElhaney was terminated for "violation of company policy/rules/procedures."

119.

Ms. Dowdell-McElhaney was given no warning, Ms. Dowdell-McElhaney was not placed on probation, Ms. Dowdell-McElhaney received no prior reprimand or temporary suspension.

120.

At no time during her almost-five years of employment with Defendants had Ms. Dowdell-McElhaney seen any of her coworkers disciplined for a mistake of this nature.

121.

At no time during her nearly-five years of employment with Defendants had Ms. Dowdell-McElhaney ever seen an employee terminated without first receiving a verbal warning, then at least three written warnings, and then a 6-month probationary period before being terminated.

122.

Despite being terminated involuntarily for supposed violation of company policy, Defendants have indicated that Ms. Dowdell-McElhaney is eligible for rehire.

Procedural/Administrative Background

123.

After first making an inquiry on July 25, 2019, Ms. Dowdell-McElhaney filed her first Charge of Discrimination with the Equal Employment Opportunity Commission (hereinafter, "EEOC") on or about September 16, 2019, alleging that she had been subjected to discrimination based on age in violation of the Age Discrimination in Employment Act.  The EEOC assigned Ms. Dowdell-McElhaney Charge Number 410-2019-07370.

124.

Defendants had notice of Ms. Dowdell-McElhaney's first Charge of Discrimination, participated in the proceedings before the EEOC, and were represented by counsel during said proceedings.

125.

On or about August 21, 2020, the EEOC issued a Dismissal and Notice of Rights (or "right to sue letter") concerning Ms. Dowdell-McElhaney's first Charge of Discrimination.

126.

Ms. Dowdell-McElhaney exhausted her administrative remedies as to her first Charge of Discrimination, and she file the instant action within ninety days of the EEOC's issuance and her receipt of a Dismissal and Notice of Rights.

127.

On or about April 27, 2021, Ms. Dowdell-McElhaney filed her second Charge of Discrimination with the EEOC, alleging that she had been subjected to discrimination based on race and sex and retaliation in violation of Title VII of the Civil Rights Act and discrimination and retaliation based on disability in violation the Americans with Disabilities Act.  The EEOC assigned Ms. Dowdell-McElhaney Charge Number 410-2021-02269.

128.

Upon request, the EEOC issued a Notice of Right to Sue for Ms. Dowdell-McElhaney's second Charge of Discrimination on April 28, 2021.

129.

Ms. Dowdell-McElhaney now amends her pleading to add in the claims of discrimination based on race, sex, disability, and retaliation in addition to her prior claims based on age discrimination as her administrative remedies have been fully exhausted and she has received a right to sue letter less than 90 days prior to the filing of this Second Amended Complaint.

## COUNT I:
## AGE DISCRIMINATION
## IN VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT

130.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 129, as if the same were set forth herein.

131.

Pursuant to the Age Discrimination in Employment Act, it is unlawful for an employer to discriminate against any individual with respect to the compensation, terms, conditions, or privileges of his or her employment because of such individual's age. 29 U.S.C. § 623.

132.

As alleged herein, Plaintiff is a covered employee under the Age Discrimination in Employment Act, and Defendants are considered covered employers under the same. *See* 29 U.S.C. § 630.

133.

Plaintiff was between the ages of forty and seventy at all times relevant to the facts of this Complaint.

134.

As alleged herein, Plaintiff was qualified for, and satisfactorily performed the essential functions of, her position with Defendants for a period of approximately five years.

135.

Plaintiff was also qualified for other positions that she applied while she was employed with Defendants.

136.

On or about November 18, 2020, Defendants terminated Plaintiff from her position and separated her employment with Defendants.

137.

As alleged herein, Defendants also rejected Plaintiff's applications for open positions for which she qualified.

138.

After terminating Plaintiff's employment, Defendants replaced Plaintiff with an employee who was substantially younger, even though such person was less qualified that Plaintiff.

139.

Defendants also selected employees who were substantially younger than Plaintiff to fill these positions even though the other applicants were less qualified than Plaintiff.

140.

As alleged herein, Plaintiff was treated less favorably than her coworkers who were younger than her, in that she did not receive pay raises, the pay raises that she did receive were disproportionately lower, she was not provided with opportunities for training, promotions, or a change of her position.

141.

Defendants will be unable to present any evidence of a legitimate nondiscriminatory motive for failing to consider Plaintiff for the aforementioned positions and otherwise treating Plaintiff less favorably than her counterparts who were younger than Plaintiff.

142.

Plaintiff will prove that the Defendants' stated reasons are pretextual, were willful and indeed motivated by Plaintiff's age.

143.

Plaintiff has been injured by Defendants' discrimination based on age, and she is entitled to all damages allowed under the Age Discrimination in Employment Act, including back pay including fringe benefits, front pay or reinstatement, injunctive relief, liquidated damages, and attorney's fees and costs of litigation, all in an amount to be proven at trial.

**COUNT II:**
**RETALIATION IN VIOLATION OF**
**THE AGE DISCRIMINATION IN EMPLOYMENT ACT**

144.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 129, as if the same were set forth herein.

145.

Under the Age Discrimination in Employment Act, it is unlawful for an employer to discriminate against any employee because such person has "opposed any practice made unlawful by this section, or because such individual … has made a charge, testified, or participated in any matter in an investigation, proceeding, or litigation under this chapter.".  29 U.S.C. § 623(d).

146.

As alleged herein, Plaintiff is a covered employee under the Age Discrimination in Employment Act, and Defendants are considered covered employers under the same. *See* 29 U.S.C. § 630.

147.

As alleged herein, Plaintiff opposed Defendants' discriminatory practices based on her age by making internal grievances and/or complaints with her direct supervisor, the head of the human resources department, and Defendants' diversity and inclusion officer.  Accordingly, Plaintiff participated in a protected activity under the Age Discrimination in Employment Act.

148.

As alleged herein, Plaintiff made an initial inquiry with the Equal Employment Opportunity Commission on July 25, 2019, and subsequently filed a Charge of Discrimination, alleging in pertinent part, that Defendants had discriminated against her due to age in violation of the Age Discrimination in Employment Act.  Accordingly, Plaintiff's actions consisted of an activity expressly considered protected under the Age Discrimination in Employment Act.

149.

Defendants were aware that Plaintiff had submitted internal grievances and/or complaints that Plaintiff had been subjected to discrimination based on her age.

150.

Defendants were aware that Plaintiff filed a Charge of Discrimination.  Not only did Plaintiff advise her direct supervisor that she had filed a Charge, Defendants were on notice of, and participated in, the proceedings before the EEOC.

151.

As a result of Plaintiff's participation in the aforementioned protected activities, Defendants subjected Plaintiff to harassment such as the incident on October 3, 2019, in which Defendants questioned Plaintiff about the copies she was making before intentionally

embarrassing Plaintiff by escorting her off of Defendants' premises in front of many of her coworkers.

### 152.

As a result of Plaintiff's participation in the aforementioned protected activities, Defendants subjected Plaintiff to an increase in her workload and increased scrutiny of her work up and until Defendants terminated Plaintiff on November 18, 2020.

### 153.

As a result of Plaintiff's participation in the aforementioned protected activities, Defendants terminated Plaintiff's employment on November 18, 2020.

### 154.

Defendants will be unable to present any evidence of a legitimate nonretaliatory motive for subjecting Plaintiff to harassment, increasing Plaintiff's workload and the scrutiny that Defendants placed on her work, ultimately terminating Plaintiff's employment, and otherwise treating Plaintiff less favorably than her counterparts who had not engaged in activities protected by the Age Discrimination in Employment Act.

### 155.

Plaintiff will prove that the Defendants' stated reasons are pretextual, were willful and indeed motivated by Plaintiff's age.

### 156.

Plaintiff has been injured by Defendants' retaliation, and she is entitled to all damages allowed under the Age Discrimination in Employment Act, including back pay including fringe benefits, front pay or reinstatement, injunctive relief, liquidated damages, and attorney's fees and costs of litigation, all in an amount to be proven at trial.

## COUNT III:
## DISCRIMINATION BASED ON RACE
## IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT

157.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 129, as if the same were set forth herein.

158.

Under Title VII of the Civil Rights Act, it is unlawful for an employer to discriminate against any individual with respect to his or her compensation, terms, conditions, or privileges of employment because of such person's race.  42 U.S.C. § 2000e-2(a).

159.

Plaintiff is considered in a protected class as her race is black or African American.

160.

As alleged herein, Plaintiff was qualified for the position that she held with Defendants and her performance was exemplary at all times.

161.

As alleged herein, Plaintiff was also qualified for advancement and promotions to positions that came open during her tenure, but Defendants refused to consider Plaintiff's applications.

162.

As alleged herein, Plaintiff applied for countless open positions for which Plaintiff was qualified during Plaintiff's tenure with Defendants.

163.

Defendants rejected Plaintiff's applications for these positions.

164.

Defendants selected an employee who did not identify as black or African American, even though the other applicant was less qualified than Plaintiff.

165.

Defendants refused to consider Plaintiff for the positions that she applied.

166.

As alleged herein, Plaintiff was treated less favorably than her coworkers, who were not black or African American, in that she did not receive pay raises, if she did receive pay raised then the pay raises that she received were disproportionately lower, she was not provided with opportunities for training, and she was not considered for new positions, she was not considered for promotions, she was not given the appropriate time off, and her disability was given less consideration.

167.

Defendants will be unable to present any evidence of a legitimate nondiscriminatory motive for failing to consider Plaintiff for the aforementioned positions and otherwise treating Plaintiff less favorably than her counterparts who are not black or African American.

168.

Plaintiff will prove that the Defendants' stated reasons are pretextual and were indeed motivated by Plaintiff's race.

169.

Plaintiff has been injured by Defendants' discrimination based on race against her, and she is entitled to all damages allowed under Title VII of the Civil Rights Act, including back pay including fringe benefits, front pay, injunctive relief, compensatory and punitive damages in the

amount of not less than $300,000.00, and attorney's fees and costs of litigation, all in an amount to be proven at trial.

## COUNT IV:
## DISCRIMINATION BASED ON SEX
## IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT

### 170.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 129, as if the same were set forth herein.

### 171.

Under Title VII of the Civil Rights Act, it is unlawful for an employer to discriminate against any individual with respect to his or her compensation, terms, conditions, or privileges of employment because of such person's sex.  42 U.S.C. § 2000e-2(a).

### 172.

Plaintiff is considered in a protected class as her sex is female.

### 173.

As alleged herein, Plaintiff was qualified for the position that she held with Defendants and her performance was exemplary at all times.

### 174.

As alleged herein, Plaintiff was also qualified for advancement and promotions to positions that came open during her tenure, but Defendants refused to consider Plaintiff's applications for such positions.

### 175.

As alleged herein, Plaintiff applied for countless open positions for which Plaintiff was qualified during Plaintiff's tenure with Defendants.

176.

Defendants rejected Plaintiff's applications for these positions.

177.

Defendants selected employees who did not identify as female, even though the other applicants were less qualified than Plaintiff.

178.

Defendants refused to consider Plaintiff for these positions.

179.

As alleged herein, Plaintiff was treated less favorably than her coworkers, who were not female, in that the pay raises that she received were disproportionately lower, she was not provided with opportunities for training, and she was excluded from internal meetings.

180.

Defendant will be unable to present any evidence of a legitimate nondiscriminatory motive for failing to consider Plaintiff for the aforementioned positions and otherwise treating Plaintiff less favorably than her counterparts who are not female.

181.

Plaintiff will prove that the Defendants' stated reasons are pretextual and were indeed motivated by Plaintiff's sex.

182.

As a result of her sex, Defendants increased Plaintiff's workload and ultimately terminated her.

183.

Plaintiff has been injured by Defendants' discrimination based on sex against her, and she is entitled to all damages allowed under Title VII of the Civil Rights Act, including back pay including fringe benefits, front pay, injunctive relief, compensatory and punitive damages in the amount of not less than $300,000.00, and attorney's fees and costs of litigation, all in an amount to be proven at trial.

## COUNT V:
## RETALIATION IN VIOLATION OF
## TITLE VII OF THE CIVIL RIGHTS ACT

184.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 129, as if the same were set forth herein.

185.

Under Title VII of the Civil Rights Act, it is unlawful for an employer to retaliate against an employee because she has opposed any unlawful employment practice.  *See* 42 U.S.C. § 2000e-3(a).

186.

As alleged herein, Plaintiff complained to her direct supervisor, as well as several other managers within the company, about what she perceived as discriminatory conduct based on Plaintiff's race and sex and other retaliation by Defendants, and Plaintiff urged the aforementioned supervisors and managers Defendants to address the conduct and to stop the discriminatory treatment.

187.

As alleged herein, on June 25, 2019, Plaintiff made an initial inquiry with the EEOC and subsequently filed a Charge of Discrimination on September 16, 2019, in which she raised allegations that she had been discriminated against based on race and sex.

188.

Defendants were aware of the Charge of Discrimination.

189.

Defendants terminated Plaintiff's employment because of Plaintiff's reports to management about the discriminatory and retaliatory behavior of Defendants and based on Plaintiff's filing an EEOC charge of discrimination against Defendants.

190.

As a result of her participating in protected activities, Defendants increased Plaintiff's workload and ultimately terminated her employment.

191.

Plaintiff has been injured by Defendants' retaliatory conduct in response to Plaintiff's participation in protected activities, and Plaintiff is entitled to all damages allowed under the Title VII of the Civil Rights Act, including compensatory damages, reinstatement, backpay, injunctive relief, punitive damages, and reasonable attorney's fees and costs of litigation, in an amount to be proven at trial.

**COUNT VI:**
**DISCRIMINATION IN VIOLATION OF**
**THE AMERICANS WITH DISABILITIES ACT**

192.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in

Paragraphs 1 through 129, as if the same were set forth herein.

193.

The Americans with Disabilities Act prohibits covered entities from "discriminating against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

194.

As alleged herein, Defendants and Plaintiff are covered, nonexempt employers and non-exempt employee under the ADA, respectively. *See* 42 U.S.C. § 12111.

195.

As alleged herein, Plaintiff has been employed with Defendants for nearly five years served in the role of first customer service representative and then fraud analyst.  Plaintiff had been performing her duties in those roles, and was otherwise qualified and able to perform the essential functions of her job, with or without a reasonable accommodation.

196.

As alleged herein, Plaintiff has a disability, a history of a disability, and was perceived by Defendants as having a disability, that substantially limits a number of major life activities.

197.

Specifically, Plaintiff suffers from severe back pain and weakness in her back muscles and spine as a result of a car accident in 2018.

198.

Additionally, Plaintiff suffers from aggravated migraines, or recurring headaches that cause severe throbbing or pulsating pain, nausea, sensitivity to light and noise, weakness, and fatigue.

199.

All of the aforementioned conditions, individually and in the aggregate, substantially limit several major life activities for Plaintiff such as lifting, performing manual tasks, reaching, sitting, sleeping, standing, walking, and working.

200.

Defendants were aware of Plaintiff's disabilities, in part, because Plaintiff submitted several requests for a reasonable accommodation for said disabilities.

201.

As alleged herein, from 2018 until the time of her termination, Plaintiff regularly requested that she be permitted the reasonable accommodation of using a sit and stand desk.

202.

As alleged herein, Defendants refused to grant Plaintiff's request for reasonable accommodation.

203.

Moreover, during the COVID-19 pandemic, Plaintiff requested that she be permitted to telework because both she and her husband have medical conditions that have caused them to be consider high risk of severe symptoms if infected with COVID-19.

204.

Initially, in April 2020, Defendant denied Plaintiff's request to telework, and it was not

until Plaintiff went above her immediate supervisor to Human Resources that her request was granted.

205.

In November 2020, while the conditions giving rise to Plaintiff's concern about the virus remained present and were increasing in the community, Defendant tried to force Plaintiff to return to working in-person in the office.

206.

In response, Plaintiff expressed her ongoing concerns and hesitation about returning to the office.  Plaintiff requested that Defendant continue accommodating her condition, as well as that of her husband, by allowing her to continue teleworking.

207.

Instead of considering or granting Plaintiff's request to continue teleworking, Defendants terminated Plaintiff's employment just several days later.

208.

Instead of considering or granting Plaintiff's request to continue teleworking, Defendants terminated Plaintiff's employment just several days later.

209.

As alleged herein, the circumstances suggest that Defendants terminated Plaintiff's employment specifically because of Plaintiff's disability.

210.

Defendant will be unable to present any evidence of a legitimate nondiscriminatory motive for terminating Plaintiff's employment.

211.

Plaintiff will prove that the Defendants' stated reasons are pretextual and were indeed motivated by Plaintiff's disability.

212.

Plaintiff has been injured by Defendants' discrimination based on disability against her, and she is entitled to all damages allowed under Americans with Disabilities Act, including back pay including fringe benefits, front pay, injunctive relief, compensatory and punitive damages in the amount of not less than $300,000.00, and attorney's fees and costs of litigation, all in an amount to be proven at trial.

## COUNT VII:
## FAILURE TO PROVIDE REASONABLE ACCOMMODATION
## IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

213.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 129, as if the same were set forth herein.

214.

The Americans with Disabilities Act prohibits covered entities from "discriminating against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

215.

Discrimination based on disability includes an employer's failure to make a "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that

the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).

216.

As alleged herein, Defendants and Plaintiff are covered, nonexempt employers and non-exempt employee under the ADA, respectively. *See* 42 U.S.C. § 12111.

217.

As alleged herein, Plaintiff has been employed with Defendants for nearly five years served in the roles of customer service representative and the fraud analyst.  Plaintiff had been performing her duties in those roles, and was otherwise qualified and able to perform the essential functions of her job, with or without a reasonable accommodation.

218.

As alleged herein, Plaintiff has a disability, a history of a disability, and was perceived by Defendants as having a disability, that substantially limits a number of major life activities.

219.

Specifically, Plaintiff suffers from severe back pain and weakness in her back muscles and spine as a result of a car accident in 2018. All of these conditions, individually and in the aggregate, substantially limit several major life activities for Plaintiff such as lifting, performing manual tasks, reaching, sitting, sleeping, standing, walking, and working.

220.

Defendants were aware of Plaintiff's disabilities and her need for a reasonable accommodation.

221.

Moreover, Plaintiff requested an accommodation for her disability on a number of

occasions. Specifically, Plaintiff requested that Defendants adjust her work responsibilities to not require overtime and to provide her with a sit and stand desk.

222.

The accommodations requested were available, would have been effective, and would not have posed an undue hardship on Defendants.

223.

Defendants not only failed to provide to provide the requested accommodation, Defendants told Plaintiff that she would not be accommodated.

224.

Despite refusing Plaintiff's requests, Defendants provided these same accommodations to Plaintiff's co-workers who appeared not to suffer from any disabilities or otherwise need an accommodation.

225.

In addition to Defendants' failure to provide a reasonable accommodation, Defendants refused to engage Plaintiff in the interactive process, despite Plaintiff repeated efforts to do so.

226.

As a result of Plaintiff's request for an accommodation, Defendants increased Plaintiff's workload and ultimately terminated her employment.

227.

Plaintiff has been injured by Defendants' discrimination based on disability due to its failure to provide a reasonable accommodation, and Plaintiff is entitled to all damages allowed under Americans with Disabilities Act, including back pay including fringe benefits, front pay,

injunctive relief, compensatory and punitive damages in the amount of not less than $300,000.00, and attorney's fees and costs of litigation, all in an amount to be proven at trial.

## COUNT VIII:
## RETALIATION IN VIOLATION OF
## THE AMERICANS WITH DISABILITIES ACT

228.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 129, as if the same were set forth herein.

229.

The Americans with Disabilities Act prohibits covered entities from discriminating against any individual because such individual has opposed any act or practice made unlawful by the Americans with Disabilities Act or because said individual has filed a Charge of Discrimination. 42 U.S.C. § 12203(a).

230.

As alleged herein, beginning in March 2018, Plaintiff began submitting internal grievances and/or complaints to Defendants that she had been denied her request for a reasonable accommodation.

231.

Plaintiff had a good faith belief that she was being discriminated against based on disability. As a result, she made an initial inquiry with the Equal Employment Opportunity Commission and subsequently filed a Charge of Discrimination on September 16, 2019, in which she raised allegations that she had been discriminated against based on disability.

232.

Defendants were aware of the Charge of Discrimination.

233.

Defendants terminated Plaintiff's employment because of Plaintiff's reports to management about the discriminatory conduct based on Plaintiff's disability, including Defendants' failure to provide a reasonable accommodation, and because Plaintiff filing a Charge of Discrimination with the Equal Employment Opportunity Commission against Defendants for such conduct.

234.

As a result of her participating in protected activities, Defendants increased Plaintiff's workload and ultimately terminated her employment.

235.

Plaintiff has been injured by Defendants' retaliatory conduct, and Plaintiff is entitled to all damages allowed under Americans with Disabilities Act, including back pay including fringe benefits, front pay, injunctive relief, compensatory and punitive damages in the amount of not less than $300,000.00, and attorney's fees and costs of litigation, all in an amount to be proven at trial.

**COUNT IX:**
**FAILURE TO PAY OVERTIME PAY**
**IN VIOLATION OF THE FAIR LABOR STANDARDS ACT**

236.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 129, as if the same were set forth herein.

237.

Under the Fair Labor Standards Act, an employer must pay a rate of not less than one and one-half times an employee's regular rate for any time worked in excess of forty hours for any given workweek. *See* 29 U.S.C. § 201(a)(1).

238.

As alleged herein, Defendants and Plaintiff are covered, non-exempt employers and employee under the Fair Labor Standards act, respectively.  *See* 29 U.S.C. § 201(a)(1).

239.

As alleged herein, Plaintiff frequently worked in excess of forty hours per workweek.

240.

Defendants were aware of the fact that Plaintiff frequently worked in excess of forty hours per workweek.

241.

However, Defendants failed to compensate Plaintiff for any hours worked in excess of forty per workweek at the appropriate overtime rate.

242.

Defendants' conduct, as alleged herein, constitutes failing to provide overtime pay in violation of the Fair Labor Standards Act.

243.

Plaintiff has been injured by Defendants' actions and is entitled to an award of unpaid overtime compensation and all other damages allowed under the Fair Labor Standards Act for the period preceding two years prior to the filing of her initial action civil action, as well as reasonable attorneys' fees and costs of litigation to be paid by Defendant pursuant to 29 U.S.C. § 216(b), in an amount to be proven at trial.

244.

The evidence will reflect the fact that Defendants willfully violated the Fair Labor Standards Act when it failed to compensate Plaintiff at the appropriate rate of overtime, and thus,

Plaintiff should be permitted to recover all damages listed in the preceding paragraph for the period of three years prior to the filing of this action.

245.

Moreover, Defendants have acted in bad faith and did not have reasonable grounds to believe that its actions were not a violation of the Fair Labor Standards Act.

246.

This Court should exercise its sound discretion to award liquidated damages pursuant to 29 U.S.C. § 260, and should award to Plaintiff said liquidated damages in an amount equal to an award for unpaid overtime compensation.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Sherrell Dowdell-McElhaney respectfully prays for the following relief:

1) That Summons and Process be issued to Defendants Global Payments, Inc. and Total System Services, LLC, and that said Defendants be served as provided by law;

2) That this matter be tried before a jury;

3) That judgment be awarded for and in favor of Plaintiff and against Defendants on Count I for discrimination based on age, and grant Plaintiff all relief allowable under the Age Discrimination in Employment Act;

4)      That judgment be awarded for and in favor of Plaintiff and against Defendants on Count II for retaliation, and grant Plaintiff all relief allowable under the Age Discrimination in Employment Act;

5)      That judgment be awarded for and in favor of Plaintiff and against Defendants on Count III for discrimination based on race, and grant Plaintiff all relief allowable under Title VII of the Civil Rights Act;

6)      That judgment be awarded for and in favor of Plaintiff and against Defendants on Count IV for discrimination based on sex, and grant Plaintiff all relief allowable under Title VII of the Civil Rights Act;

7)      That judgment be awarded for and in favor of Plaintiff and against Defendants on Count V for retaliation, and grant Plaintiff all relief allowable under Title VII of the Civil Rights Act;

8)      That judgment be awarded for and in favor of Plaintiff and against Defendants on Count VI for discrimination based on disability, and grant Plaintiff all relief allowable under the Americans with Disabilities Act;

9)      That judgment be awarded for and in favor of Plaintiff and against Defendants on Count VII for failure to provide a reasonable accommodation for Plaintiff's disabilities, and grant Plaintiff all relief allowable under the Americans with Disabilities Act;

10)     That judgment be awarded for and in favor of Plaintiff and against Defendants on Count VIII for retaliation, and grant Plaintiff all relief allowable under the Americans with Disabilities Act;

11)     That judgment be awarded for and in favor of Plaintiff and against Defendants on Count IX for failing to compensate Plaintiff at the appropriate rate of overtime, and grant Plaintiff

all relief allowable under the Fair Labor Standards Act, including liquidated damages and attorney's fees and costs of litigation; and,

12)     For such other relief as this Court shall deem just and proper.

Respectfully submitted, this 27th day of July, 2021.

KENNETH E. BARTON III
Georgia Bar No. 301171
JOHN M. MCCALL
Georgia Bar No. 778954
*Attorneys for Plaintiff*

COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
(478) 841-9007 telephone
(478) 841-9002 facsimile
keb@cooperbarton.com
jmm@cooperbarton.com

## CERTIFICATE OF SERVICE

This is to certify that I have this day served the foregoing SECOND AMENDED COMPLAINT to the Clerk of Court using the CM/ECF system, which will automatically send electronic mail notification of such filing to the following counsel of record, who are CM/ECF participant(s):

Patrick L. Lail, Esq.
Pamela E. Palmer, Esq.
Elarbee, Thompson, Sapp & Wilson, LLP
800 International Tower
229 Peachtree Street, N.E.
Atlanta, Georgia 30303
lail@elarbeethompson.com
palmer@elarbeethompson.com
*Attorneys for Defendants*

This 27th day of July, 2021.

KENNETH E. BARTON III
Georgia Bar No. 301171
JOHN M. MCCALL
Georgia Bar No. 778954
*Attorneys for Plaintiff*

COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
(478) 841-9007 telephone
(478) 841-9002 facsimile
keb@cooperbarton.com
jmm@cooperbarton.com