IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

SHERRELL DOWDELL-MCELHANEY,

      Plaintiff,

v.

GLOBAL PAYMENTS INC. and TOTAL
SYSTEM SERVICES, LLC,

      Defendants.

Civil Action No.:

4:20-cv-00289-CDL

## BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COMES NOW Plaintiff Sherrell Dowdell-McElhaney (hereinafter, "Plaintiff" or "Dowdell-McElhaney"), by and through undersigned counsel, and files her Brief in Opposition to Defendants' Motion for Summary Judgment. (Doc. 57.) For the reasons that follow, Defendants are not entitled to summary judgment and their Motion should be denied, respectfully showing the Court as follows:

### I.    INTRODUCTION

The instant litigation arises from Ms. Dowdell-McElhaney's employment with Defendants Global Payments Inc. and Total System Services, LLC (hereinafter, "Defendants"). Ms. Dowdell-McElhaney is a fifty-six-year-old, black female, and has several medical conditions that qualify as disabilities under the applicable statutes. (Doc. 34, ¶¶ 12-16.) Ms. Dowdell-McElhaney was most recently employed with Defendants from 2016 through 2020 as Fraud Analysist II. (*Id.*, ¶¶ 19, 21, 40-41.) Prior to her employment, Ms. Dowdell-McElhaney had earned several degrees, including a Bachelor of Arts, Doctor of Jurisprudence, and Master of Laws, and as a result of her educational background and otherwise, she was qualified for both her position, as well as open positions that she pursued while employed. (*Id.*, ¶ 17, 26.) She maintained exemplary performance while

working for Defendants, and Ms. Dowdell-McElhaney often worked in excess of 40 hours per work, she picked up slack from her coworkers, and she was frequently the only person in her department working in the office. (*Id.*, ¶¶ 20, 23-25, 27.)

When she initially applied to work for Defendants in 2014, Ms. Dowdell-McElhaney alleges that she received less favorable treatment and consideration than younger, white applicants who did not have nearly the same qualifications as her.  (*Id.*, ¶¶ 28-34.) Ultimately, Ms. Dowdell-McElhaney's first stint of employment ended when, as a result of Defendants' refusal to consider her for another position as they had assured her, she voluntarily resigned in July 2014. (*Id.*, ¶¶ 28-34.)

In November 2015, she applied for the open position of Paralegal II, but despite meeting all of the requirements for the job, she was told that she would not be getting the position because she was overqualified.  (*Id.*, ¶¶ 35-38.)  Instead, Defendants offered the Paralegal II position to a younger, white female who, unlike Ms. Dowdell-McElhaney, had no legal experience.  (*Id.*, ¶ 39.)

In February 2016, Ms. Dowdell-McElhaney applied once again for an open Fraud Analyst II position, and after an interview, she was finally offered and accepted this position. (*Id.*, ¶¶ 40-41.) Over the course of the next four years, Defendants treated Ms. Dowdell-McElhaney less-favorably than her coworkers and she was subjected to disparate treatment.  For example, Defendants denied her requests an accommodation that she had discussed with her medical provider. (*Id.*, ¶¶ 49-56.)  She submitted dozens of applications for promotions and open positions for which she was qualified, but Defendants refused to consider her applications.  (*Id.*, ¶¶ 57-69.) Ms. Dowdell-McElhaney also sought out a position on Defendants' newly created "First Party Fraud Team," but as with other occasions, she was passed over in favor of younger, white applicants with less qualifications or experience than her.  (*Id.*, ¶¶ 70-72.)   Ms. Dowdell-

McElhaney spoke to representatives of Defendants' Human Resources Department, as well as company executives, and she addressed her concerns of the racial, ethnic, and gender inequities and age and disability discrimination that she had experienced.  (*Id.*, ¶¶ 74-77.)

After taking several weeks to collect her thoughts, as well as documentation in support of her complaints, Ms. Dowdell-McElhaney made contact with the Equal Employment Opportunity Commission (hereinafter, "EEOC") in Summer 2019. (*Id.*, ¶¶ 78-80, 123.)  On September 16, 2019, she returned a "Form 5" Charge of Discrimination to the EEOC.  (*Id.*, ¶ 123.)  Approximately two weeks later, Ms. Dowdell-McElhaney obtained permission from a supervisor to copy documents in support of her Charge; yet, despite having received permission in advance, Defendants accused her of stealing Defendants' confidential information. (*Id.*, ¶¶ 85-101.) Defendants then suspended Ms. Dowdell-McElhaney and escorted her from the building with the help of law enforcement. (*Id.*)  The next day, a supervisor reached out to her to advise her that the employer found no wrongdoing and that she should return to work immediately. (*Id.*)

From this time, until she was terminated, Defendants not only continued to discriminate against Ms. Dowdell-McElhaney, they subjected her to retaliation for her internal complaints and for filing a Charge of Discrimination.  (*Id.*, ¶¶ 102-15.) On November 18, 2020, Defendants terminated Ms. Dowdell-McElhaney without receiving any advance warning.  (*Id.*, ¶¶ 116-22.)

Defendants argue that they terminated Ms. Dowdell-McElhaney because she was engaged in a pattern of "call avoidance," where she would intentionally fail to respond to cardholders on the other end of the line, and then notate that she was unable to make contact with such cardholders. (Doc. 57-1 at 2.)  Defendants state that they confronted Ms. Dowdell-McElhaney, who did not have any valid response to the allegation.  (*Id.*)  Purportedly, after Defendants confronted Ms. Dowdell-McElhaney with such charges, she continued to avoid calls over the remaining week.

(*Id.*)   According to Defendants, this was the reason that they decided to fire Ms. Dowdell-McElhaney after her prior five years of satisfactory, if not stellar, performance. (*Id.*)

## II.     ARGUMENT AND CITATION OF AUTHORITY

### A.     Legal Standard for Summary Judgment.

The Court should deny summary judgment when the record reflects that there are genuine issues as to material facts.  *See* Fed. R. Civ. P. 56(a).  A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party.  *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  A factual issue is material if resolving the factual issue might change the suit's outcome under the governing law.  Id.  Such a motion should only be granted if no rational fact finder could return a verdict in favor of the non-moving party.  *Id*. at 249.

In ruling on the instant Motion, the Court must view all evidence in the light most favorable to Ms. Dowdell-McElhaney as the non-moving party and resolve all factual disputes in her favor. *See Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000).  The moving party need not positively disprove the opponent's case; rather, the moving party must establish the lack of evidentiary support for the non-moving party's position.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  If the moving party meets this initial burden, in order to survive summary judgment, the non-moving party must then present competent evidence beyond the pleadings to show that there is a genuine issue for trial.  *Id*. at 324-26.  The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.

### B. Defendant Global Payments Has Not Established That it is Entitled to Summary Judgment.

It is possible for two or more businesses to be held liable for violations of the employment discrimination statutes under the "joint employer" theory; however, this is a factual issue to be determined based upon evidence in the record, for which summary judgment is not appropriate under the circumstances of this case. *See Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350, 1359-61 (11th Cir. 1994). To be considered a joint employer, an entity must exercise sufficient control over the terms and conditions of a plaintiff's employment. *Id.* at 1360.  Courts usually make such a determination by analyzing whether, as a matter of practice, an entity has control over: (1) the means and manner of the plaintiff's work performance; (2) the terms, conditions, or privileges of the plaintiff's employment; and (3) the plaintiff's compensation. *Llampallas v. Mini-Circuits, Inc.*, 163 F.3d 1236, 1245 (11th Cir. 1998).

The Eleventh Circuit has identified three circumstances in which it is appropriate to aggregate multiple entities for the purposes of counting employees. *Kingsley v. Tellworks Commc'ns, LLC*, 2017 WL 2624555, at *16-17 (N.D. Ga. 2017), report and recommendation adopted, 2017 WL 2619226 (N.D. Ga. June 15, 2017) (quoting *Lyes v. City of Riviera Beach, Fla*, 166 F.3d 1332, 1341 (11th Cir. 1999)).  First, where two separate entities are "highly integrated with respect to ownership and operations," we may count them together under Title VII; this is the "single employer" or "integrated enterprise" test. *Lyes* 166 F.3d at 1341. Second, where two entities contract with each other for the performance of some task, and one company retains sufficient control over the terms and conditions of employment of the other company's employees, we may treat the entities as "joint employers" and aggregate them. *Id*. This is the "joint employer" test. Third, where an employer delegates sufficient control of some traditional rights over

employees to a third party, we may treat the third party as an agent of the employer and aggregate the two when counting employees. *Id*. This is the "agency" test.

In this instance, Defendants argue that Defendant Global Payments Inc. is entitled to summary judgment in its favor because it did not employ Dowdell-McElhaney. However, Defendants have admitted that Defendant Global Payments Inc. is the parent company of Defendant TSYS. (Doc. 57-5, ¶ 3.) However, this still supports the fact that Defendants are a single, integrated enterprise. "The single employer analysis involves examining various factors to determine if two nominally independent entities are so interrelated that they actually constitute a single integrated enterprise...." *Swallows v. Barnes & Noble Book Stores, Inc*., 128 F.3d 990, 993 n.4 (6th Cir. 1997). As the Eleventh Circuit has stated:

> The predominant trend in determining whether two businesses should be treated as a single or joint employer [under Title VII] is to apply the standards promulgated by the National Labor Relations Board (NLRB). The NLRB factors include: (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control. The showing required to warrant a finding of single employer status has been described as highly integrated with respect to ownership and operations.

*McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930, 933 (11th Cir. 1987). The single employer analysis ultimately "concentrate[s] on the degree of control an entity has over the [allegedly liable conduct]" on which the suit is based. *Llampallas,* 163 F.3d at 1244-45. However, not every factor must be present, nor is any single factor controlling. *Lyes,* 166 F.3d at 1341 n.5. Based solely on Defendants' arguments, it would appear that both Defendants have a common management, including Leslie Luck, and there is common ownership between both Defendants. (*See* Doc. 57-6, ¶¶ 2-3.)

Moreover, a review of the documents provided by Defendants in support of its Motion would reflect that even if Defendant TSYS were indeed a separate entity, it frequently operates

under, or holds itself out to be, the name "Global Payments." (*See, e.g.*, Doc. 58-2 at 1-80, Doc, 58-3 at 16, Doc. 57-6 at 2.)  While it would certainly appear that Defendants should be considered a single employer or integrated enterprise, Defendants have failed to meet their burden of showing that there is a lack of evidentiary support that they are, and Defendants are not entitled to summary judgment as a result.

> **C. Defendants are Not Entitled to Summary Judgment on Plaintiff's Age Discrimination Claims Concerning Defendants' Refusal to Place her on the First Party Fraud Team.**

There are genuine issues of material fact concerning whether Defendants' failure to assign Dowdell-McElhaney to the First Party Fraud (hereafter, "FPF") Team constituted discrimination based on age under the Age Discrimination in Employment Act (hereinafter, "ADEA").

In order to establish a *prima facie* case of age discrimination in violation of the ADEA, a plaintiff must show that:

> (1) she was a member of a protected group of persons between the ages of 40 and 70, (2) she was subject to an adverse employment action, (3) a substantially younger person filled the position from which she was discharged, and (4) she was qualified to do the job for which she was rejected.

*Lawson v. Plantation Gen. Hosp., L.P.*, 704 F. Supp. 2d 1254, 1281 (S.D. Fla. 2010) (citing *Chapman v. A.I. Transp.*, 228 F.3d 1012, 1024 (11th Cir. 2000); *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1359 (11th Cir. 1999)).  Defendants argue that assignment to the FPF Team would not have come with a change in pay or title, and as a result, Dowdell-McElhaney is unable to show a "serious and material change" in the terms, conditions, or privileges of employment, and as a result the *prima facie* element of an adverse employment action. (Doc. 57-1 at 5-7.)  According to Defendants, even if Dowdell-McElhaney had established such *prima facie* element, Defendants had legitimate reasons for not selecting her for this role. (*Id.*)

Defendants have failed to establish that inclusion of members on the FPF Team had no impact on their pay.  According to Defendant's records, a merit increase is based on a number of factors, including "individual performance, salary history, and internal equity." (Doc. 58-2 at 55, 56.)  Defendants argue that two of the three individuals who were placed on the FPF Team received annual merit increases on the same day as Dowdell-McElhaney. (Doc. 57-1 at 6-7 (citing Doc. 57-3, ¶ 55; Doc. 57-3 at 6-10.)  According to Defendants' records, Defendant appears to have granted Dowdell-McElhaney such merit increases in 2019 and 2020 based on her performance. (*See* Doc. 58-2 at 55-56 (stating that Plaintiff had done a good job, thanking her for her hard work, and stating that the supervisor was looking forward to great things in the year 2020).

However, Defendants provide absolutely no explanation as to its reasons for granting merit increases to Duke and/or Garner.  Since Defendants point to no evidence on this issue, they should not be permitted to argue that their selection on the FPF Team was not the reason for either the increase in compensation *or the amount of such increase*.  The latter point is particularly important because on April 1, 2019, Dowdell-McElhaney's compensation went from $15.11 to $15.34 (Doc. 57-3 at 10), an increase of 1.52%.  Duke and Garner had been receiving $11.50 per hour prior to April 1, 2019, when both individual's pay was increased to $11.82 per hour (Doc. 57-3 at 6, 8), an increase of 2.78%.  As a result, Duke's and Garner's merit increases were greater than Dowdell-McElhaney, both in terms of the numerical increase, as well as percentage.  Defendants have failed to provide any evidence concerning this disparity, and as a result, this should not be seen to support Defendant's contention that assignment to the FPF Team did not come with a raise.

Moreover, approximately five months after Garner was selected to the FPF Team, he received a raise of around $2.07, or a 17.52% increase in his pay. (Doc. 57-3 at 8.)  Defendants do not address such change in compensation.  If Garner's raise had been because he was on the FPT

Team at that time, or because his prior assignment to that team had opened up opportunities for other promotions or reassignments, that would also support Dowdell-McElhaney's position that this was a more desirable assignment.[1]

Whether Defendants' failure to select Dowdell-McElhaney for the FPF constitutes an adverse employment action is one for the jury.  Whether an employer's assignments constitute a "serious and material change in the terms, conditions, or privileges of employment, and therefore an adverse employment action, depends on whether a reasonable person in the circumstance would have viewed such assignment as material adverse. *See Dysart v. Palms of Pasadena Hosp., LP*, 89 F. Supp. 3d 1311, 1321 (M.D. Fla. 2015) (in context of Section 1981 claim) (citing *Davis*, 245 F.3d at 1238).  Deciding whether Defendants' refusal to select Dowdell-McElhaney for this team is deemed materially adverse is a factual dispute that should be left for the jury. *Id.*; *see also Diehl v. Bank of Am.*, No. 3:09-cv-1220, 2011 WL 13174774, *3 (M.D. Fla. 2011).  The evidence reflects that one of the individuals selected for this team said that is came with a pay increase and that the said individual excited shared the news of his promotion and moving to a new facility with Dowdell-McElhaney and he expressed remorse for the fact that Dowdell-McElhaney was not selected.  (Doc. 58-1 at 108:25-110:6; 112:22-115:9.)

Moreover, even Defendants' references to the FPF undermine their arguments. According to Defendants' brief, the FPF Team was one of Defendants' "specialty teams." (Doc. 57-1 at 6.) As a result, Defendants apparently did not consider the FPF Team merely a run-of-the-mill assignments.   There was something special and unique about what the FPF Team did, and

---

[1] This is especially true given that, as addressed in response to SOF 48, Dowdell-McElhaney applied for at least 70 open position during the period between October 22, 2017 and September 12, 2019, and was not selected for a single position. Conversely, Garner successfully obtained a transfer or promotion after he had only been working for Defendants for around fifteen (15) months, about five months of being selected to the FPF Team. (*See* Doc. 57-3 at 8.)

presumably, who was asked to be included.  As a result, even if selection on this team did not come with an impact to salary or hours, the refusal of Defendants to consider Dowdell-McElhaney for this specialty team was certainly a material harm, both due the tasks that she was normally assigned, as well as the apparent opportunity for additional promotions in the company.  The Court should deny Defendants' Motion for Summary Judgment concerning the ADEA claim because there are numerous genuine issues of material fact concerning this issue, and whether Defendants refusal to consider Dowdell-McElhaney for the FPF Team was an adverse action is ultimately a question for the jury.

Moreover, the evidence does not support the fact that Defendants refused to consider Dowdell-McElhaney based on her previous performance, including her ability to resolve identity theft issues in a team setting, advanced, fraud understanding, and ability to work without needing to run most decisions by a manager. (*See* Doc. 57-1 at 7.)  Indeed, that may be what Dowdell-McElhaney's manager now says in his Declaration filed in support of the instant Motion. (*See* Doc. 57-4, ¶7.)  However, in his evaluation of Dowdell-McElhaney just several months earlier, Anderson noted that Dowdell-McElhaney performed well under stress/pressure/deadlines, she was a "team player," and she was a "motivated self-starter." (Doc. 65-3 at 3.)  Moreover, Anderson also reported that Dowdell-McElhaney met expectations when being compared to others performing the same job, Anderson would rehire Dowdell-McElhaney or recommend her to be hired for a new position, and that she had consistently received good reviews during her last performance ratings.  (*Id.* at 3-4.)  Additionally, the comments that Anderson made when Dowdell-McElhaney was granted merit increases in February 2019 and February 2020 also support that she would not have had an issue meeting the expectations of this specialty team. (Doc, 58-2 at 55-56.)  That would be especially true if, had Dowdell-McElhaney been selected for the FPF Team, she

would have continued to have the same title (*see* Doc. 57-1 at 5), as she held when she had received such positive reviews and comments.

Accordingly, there are genuine issues of material fact concerning the underlying reasons for Defendants' refusal to consider and place Dowdell-McElhaney on the FPF Team. Moreover, there is also conflicting evidence as to whether Defendants' non-selection of Dowdell-McElhaney for this specialty team constitutes an adverse action, and the ultimate determination is one for a jury. As a result, the Court should deny summary judgment to Defendants on Dowdell-McElhaney's age discrimination claim.

### D. Defendants' Suspension of Plaintiff for Making Copies in Support of Her EEOC Charge Establishes Defendants' Knowledge of Plaintiff's Participation in Protected Activities and Defendants' Retaliatory Motive.

Defendants argue that they are entitled to summary judgment on Dowdell-McElhaney's allegation that she was subjected to retaliation when she was suspended in October 2019. However, Defendants fail to appreciate that allegations concerning said one-day suspension are merely background to Dowdell-McElhaney's retaliation claim, and was not intended as an independent claim.

In her Third Amended Complaint,[2] Dowdell-McElhaney alleges that she made an initial inquiry with the EEOC on July 25, 2019, and that she subsequently filed a Charge of Discrimination on September 16, 2019, alleging age discrimination in violation of the ADEA. (Doc. 34, ¶¶ 123, 148.) Dowdell-McElhaney further alleges Defendants' knowledge of her participation in protected activities is evidenced by the fact that she advised her supervisor that she had filed such a complaint. (*Id.*, ¶ 150.) However, it was the circumstances surrounding her October 3, 2019 suspension that made it apparent that Defendants were aware of her participation

---

[2] As previously discussed, the title of Plaintiff's Second Amended Complaint was erroneous, and it should have referred to as her Third Amended Complaint.

in protected activities since Defendants questioned why Dowdell-McElhaney had been making such copies. (*Id.*, ¶ 151.) In response, Dowdell-McElhaney explained that she was making copies in support of her EEOC Charge, that her supervisor was not only aware of this reason, and that he had given her permission to do so. (*Id.*, ¶¶ 85-94.)  However, of equal importance is the other events surrounding the copies, including the fact that Dowdell-McElhaney's activities were being watched by her coworkers, she was immediately accused of engaging in inappropriate conduct, and she was asked to hand over her badge and immediately escorted off of the property. (*Id.*, ¶¶ 90-98.)  The following day, it was determined that Dowdell-McElhaney had indeed been doing as she said, she was not copying confidential customer information, and she had been given permission by her supervisor to do so – yet, Defendants did not apologize for the mistake, and demanded that Dowdell-McElhaney immediately return to work. (*Id.*, ¶ 99.)  Dowdell-McElhaney then uses the events that occurred on October 3, 2019 to support the allegations of the treatment that she received up and until her termination on November 18, 2020. (*Id.*, ¶¶ 152-153.)

As discussed further below, the Court should find that Dowdell-McElhaney's allegations concerning the October 3, 2019 suspension were intended as background in support of the fact that her termination, and the events occurring the intervening, but actionable period of time, were retaliatory.  As a result, Defendants' Motion as to this issue should be denied.

### E. Defendants Are Not Entitled to Summary Judgment on Plaintiff's Claims Concerning her Termination.

Defendants argue that they are entitled to summary judgment on Dowdell-McElhaney's claim that her termination was discriminatory and retaliatory in nature.  However, she has established *prima facia* cases of discrimination and retaliation, Defendants did not have legitimate, nondiscriminatory or nonretaliatory reasons for terminating Dowdell-McElhaney, and there are genuine issues of material fact concerning pretext that should ultimately be considered by a jury.

As a result, the Court should deny summary judgment in favor of Defendants on the claims related to their termination of Dowdell-McElhaney.

      1.   <u>Defendants' stated reasons for terminating Plaintiff's employment lack merit.</u>

Defendants appear to argue that the primary reason that they are entitled to summary judgment on Dowdell-McElhaney's claims concerning her termination because they had legitimate reasons to fire her. However, the Court can easily find that Defendants' stated reasons lack merit.

Dowdell-McElhaney was employed with Defendants on two separate occasions, totaling approximately five years of service. (*See* Doc. 57-2, ¶¶ 4-5, 68.) In her most recent position, Defendants expected for Dowdell-McElhaney to be able to handle 2,100 accounts per month. (*Id.*, ¶ 16.) The first of only two issues that Defendants have raised concerning Dowdell-McElhaney's conduct or performance were the several calls and notes that Defendants raised during the November 11, 2020 meeting regarding missed calls. (*Id.*, ¶¶ 55-63.) As Defendants note, Dowdell-McElhaney took responsibility for the few errors and dropped calls during that meeting. (*Id.*, ¶ 61.) However, as Dowdell-McElhaney argues in her response to Defendants' Statement of Facts, there is no evidence that any dropped calls were intentional, and it would appear that such calls may have been dropped due to issues with technology while she was teleworking during the early days of the COVID-19 pandemic. (*See, e.g.*, Doc. 65-1, ¶¶ 57.)

Yet, according to Defendants, they decided to terminate their five-year veteran employee merely one week later as a result of sixteen additional calls they found in reviewing all of her calls since the meeting. (Doc. 57-2, ¶¶ 65-66.) The fact that four of these calls had occurred within less than two hours of Dowdell-McElhaney's November 11, 2020 meeting and email with her supervisors, especially given that she knew she was being put under a microscope, should support

the fact that the dropped calls were in no way intentional. (*See* Doc. 65-1, ¶ 57.) Regardless, these sixteen calls that caused Defendants to immediately terminate Dowdell-McElhaney's employment were only 0.76% of the total calls that she was expected to make in a given month. (*Id.*, ¶ 66.) This is especially true given that there is no other evidence that Dowdell-McElhaney had any issues with her performance or conduct.[3] Moreover, Defendant TSYS acknowledged that, in each full month after April 2020, Dowdell-McElhaney far exceeded her goal. (Doc. 65-4 at 7 (identifying 2193 queues worked in May 2020, 2400 queues worked in June 2020, 2367 queues worked in July 2020, 2130 queues worked in August 2020, 2545 queues worked in September 2020, and 2322 queues worked in October 2020).)

One explanation for the relatively quick decision to terminate Dowdell-McElhaney between the November 11, 2020 meeting and the November 18, 2020 termination may have been an attempt to dissuade her from filing a Charge of Discrimination. As alleged, the EEOC issued a Right to Sue Letter on Dowdell-McElhaney's first Charge of Discrimination on or about August 21, 2020. (Doc. 34, ¶ 125.) Dowdell-McElhaney was required to file a civil action within 90-day of her receipt of the Right to Sue, which at the earliest would have been November 19, 2020. Not only does this temporal proximity support Dowdell-McElhanney's retaliation claim concerning her termination, Defendants' decision to terminate Dowdell-McElhaney on the day prior to the earliest that a civil action would have been due could certainly be seen as Defendants' attempts to dissuade Dowdell-McElhaney from pursuing her claims.

---

[3] Plaintiff acknowledges that her supervisor issued her a write up on or about May 13, 2020. (*See* Doc. 65-3 at 5-7.) However, this ignores the fact that this was during the early days of the pandemic, part of which was in the run up to working remotely, and Plaintiff testified that she encounter problems with her remote access when she initially began. (*See* Doc. 58-1 at 128:12-129:19.) More importantly, as Plaintiff explained in response to the written warning, she was on leave, including numerous visits to physical therapy during the time periods in question. (Doc. 65-3 at 5-7; *see also* Doc. 57-1 at 14.) As a result, to the extent that this written warning may be considered an adverse action, Plaintiff was apparently penalized, at least in part, for taking medical leave.

Defendants' stated reason for terminating Dowdell-McElhaney does not pass muster. However, it would appear that Dowdell-McElhaney was treated less-favorably than her similarly situated coworkers, and Dowdell-McElhaney should be permitted to present her evidence of Defendants' pretext to the trier of fact.

2. <u>Plaintiff was treated less favorably than her similarly situated coworkers, and she should be permitted to present evidence of pretext to the jury.</u>

Indeed, Defendants treated Dowdell-McElhaney less favorably than her similarly situated colleagues. Defendants raise the conduct of three of other employees that resulted in their termination. (*See* Doc. 57-2, ¶¶ 71-73.) However, these individuals engaged in conduct that was much different from Dowdell-McElhaney. Two of them were apparently stealing time by remaining on the clock when they were performing no work. (*See id.*, ¶¶ 71, 73.) The other apparently made false notations about making outbound calls and sending letters that she knew she had not. (*Id.*, ¶ 72.) There is no evidence that Dodwell-McElhaney stole any time during her employment or made any intentionally false statements concerning her work.

However, Defendants' identification does reveal one major disparity in their workplace. Of the three individuals identified, Defendants state that all three are black. (*Id.*, ¶¶ 71-73.) Yet, Defendants have failed to provide any disciplinary actions that it has taken against its non-black employees. Since the evidence on record appears to reflect that Defendants only terminate black employees for purported violations of its Work Avoidance Policy and/or Time Theft Policy, this would indeed support Dowdell-McElhaney's claims that she was indeed discriminated against based on race.

Indeed, Dowdell-McElhaney testified about several white, male employees who were treated better than her. Specifically, she identified Dalton, Chapman, Michael Murphy, Troy Johnson, and Jason Petty, all of whom were constantly being promoted to better positions. (Doc.

58-1 at 206:11-207:8.)   In fact, Mr. Petty and Mr. Johnson, along with Lauren Nelson were responsible for a mistake that costs Defendants more than $30,000.00. (*Id.* at 175:10-177:9.) Instead of being terminated for this conduct, they all remained in her jobs, Mr. Petty ultimately got a promotion in Defendants' IT department, and Ms. Nelson stayed with the company until her employment was separated for some other reason.  (*Id.* at 177:10-180:12.)   Dowdell-McElhaney was terminated for an error or technical issue that purportedly cause $1,910.55 in losses. (Doc. 58-3 at 23-26; *see also* Doc. 58-1 at 180:8-12.)

The Court should allow Dowdell-McElhaney to present her evidence of pretext to a jury, and she will be able to show either that it was Defendants' discriminatory and retaliatory intendent that motivated its actions against her, and that the reasons proffered by Defendant for the termination are not worthy of belief.  *See Mizell v. Miami-Dade Cnty, Fla.*, 342 F. Supp. 2d 1084, 1090 (S.D. Fla. 2004).   The evidence reflects that Dowdell-McElhaney was employed with Defendants for near five years, on two separate occasions.  Defendants have not raised any issues with Dowdell-McElhaney's performance or conduct for the vast majority of this time.  However, that does not explain why Defendants failed to provide her with the positions for which she applied, on either occasion, or on the first occasion the job that Defendants had actually offered her. (*See* Doc. 65-1, ¶¶ 4-5.)  Moreover, the fact that Dowdell-McElhaney applied for approximately 70 open positions with Defendants during the period of October 22, 2017 through September 12, 2019, none of which were offered to her, (*id.*, ¶ 48) supports the fact that she was subjected to disparate treatment. This is especially true given that Dowdell-McElhaney had decent evaluations from the same supervisor during that period of time. (*See, e,g,*, Doc. 65-3 at 1-4.)

All of this changed when Dowdell-McElhaney was overlooked for placement on Defendants' First Party Fraud Team in or around Spring 2019, and Dowdell-McElhaney

subsequently made contact with the EEOC in July 2019 and then filed a Charge of Discrimination in September 2019. (Doc. 65-1, ¶¶ 31-32.)  Defendants were aware that Dowdell-McElhaney filed a Charge of Discrimination, and the following month Dowdell-McElhaney found herself accused of copying confidential customer information, suspended, and escorted out of Defendant's facility like she was a common criminal. (*Id.*, ¶ 43.)  However, as Dowdell-McElhaney had told the person investigating the incident, she was merely collecting documentation in support of her Charge, and she had even received explicit permission from her supervisor to do so. (*Id.*, ¶¶ 43-44.)  While Dowdell-McElhaney had tried to get the person investigating to verify the authorization, he failed to do so until after she had been sent home. As soon as management verified this information, Dowdell-McElhaney was told to report back to work immediately. (*Id.* ¶ 45.)

The evidence produced by Defendants establishes the fact that, as the COVID-19 pandemic arrived, Dowdell-McElhaney was not permitted to telework until several weeks after her colleagues who white, younger, and male. (Doc. 58-3 at 4-5.)  However, Defendants do not appear to provide an explanation for such occurrence.

Still, Dowdell-McElhaney had still be performing well in the role.  In February 2020, as had been the case the prior year, Dowdell-McElhaney qualified for a merit increase, and her supervisor made specific note of her hard work and dedication. (Doc. 58-2 at 55-56.)  Indeed, there were a few months, February through April 2020, in which Dowdell-McElhaney failed to meet her performance metrics.  However, as Dowdell-McElhaney explained in her response to a written warning, Defendants ignored the fact that she had been on leave for a significant period during that time. (Doc. 65-3 at 5-7.) Defendants apparently continued to use the May 2020 write up and these metrics as a basis to criticize Dowdell-McElhaney's performance. (Doc. 57-4, ¶¶ 9-10),

despite the fact that she far exceeded the desired number of queues in each month from May 2020 until October 2020. (65-4 at 7.)

On November 11, 2020, Defendants met with Dowdell-McElhaney to ask her about a handful of her calls that were dropped. (Doc. 65-1, ¶ 57.)  Indeed, Dowdell-McElhaney was not certain as to what may have caused the dropped calls. (*Id.*)  However, the circumstances support the fact that she did not intentionally drop or avoid any calls, and it would appear that the problems resulted from a technical issue caused by remote work. (*Id.*)  Merely one-week later, Defendants decided to review Dowdell-McElhaney's calls a second time. (*Id.*, ¶ 66.)  While Defendants seemingly argue that they caught Dowdell-McElhaney engaging in the same conduct once again, the evidence would suggest that these second round of incidents were also not intentional and we still the result of problems with Dowdell-McElhaney's audio. (*Id.*)  Moreover, despite apparently reviewing all of Dowdell-McElhaney's calls, Defendants were only able to come up with sixteen examples of purportedly dropped calls during that time. (*Id.*)  Critically, these sixteen calls represent approximately 0.76% of calls that Defendants expected her to make each month. (*Id.*)

Dowdell-McElhaney will be able to prove that her termination was the result of less-favorable treatment than her similar situated colleagues who are younger, male, or not black. Moreover, given that Defendant was aware that the EEOC issued a Right to Sue Letter on Dowdell-McElhaney's first Charge of Discrimination, making her earliest possible deadline to file a civil action as November 19, 2020 (*see* Doc. 34, ¶ 125), Dowdell-McElhaney will be able to show that her termination on the previous day was a retaliatory attempt to prevent her from pursuing a civil action.

## III.   CONCLUSION

Accordingly, for the above and foregoing reasons, the Court should find that Defendants failed to meet their burden of showing that there are no genuine issues of material fact, and as a result, Plaintiff Sherrell Dowdell-McElhaney respectfully requests that the Court deny Defendants' Motion for Summary Judgment in its entirety.

Respectfully submitted, this 31st day of October, 2022.

KENNETH E. BARTON III
Georgia Bar No. 301171
*Attorney for Plaintiff*

COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
(478) 841-9007 telephone
(478) 841-9002 facsimile
keb@cooperbarton.com

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served the foregoing BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS to the Clerk of Court using the CM/ECF system, which will automatically send electronic mail notification of such filing to the following counsel of record, who are CM/ECF participant(s):

Patrick L. Lail, Esq.
Pamela E. Palmer, Esq.
Elarbee, Thompson, Sapp & Wilson, LLP
800 International Tower
229 Peachtree Street, N.E.
Atlanta, Georgia 30303
lail@elarbeethompson.com
palmer@elarbeethompson.com
*Attorneys for Defendants*

This 31st day of October, 2022.

KENNETH E. BARTON III
Georgia Bar No. 301171
*Attorney for Plaintiff*

COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
(478) 841-9007 telephone
(478) 841-9002 facsimile
keb@cooperbarton.com